## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Amy Vatnsdal,                                           Civil No. 07-715 (MJD/AJB)

      Plaintiff,

v.                                        **REPORT AND RECOMMENDATION**

Michael J. Astrue
Commissioner of Social Security,

      Defendant.

_____

     Defendant has denied Plaintiff Amy Vatnsdal's application for disability insurance

benefits (DIB) under the Social Security Act, 42 U.S.C. § 423.  Plaintiff filed a complaint

seeking review of the denial of benefits on February 1, 2007.  The action is now before the Court

on cross-motions for summary judgment.  Plaintiff is represented by Mary F. Hastings, Esq.

Defendant is represented by Lonnie F. Bryan, Assistant United States Attorney.  This Court has

jurisdiction of the matter pursuant to 42 U.S.C. § 405(g), and it is properly before the United

States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1) and

Local Rule 72.1.   For reasons stated in the following discussion, this Court recommends

denying Plaintiff's motion for summary judgment [Docket No. 8]; and granting Defendant's

motion for summary judgment [Docket No. 10].

## I.    PLAINTIFF'S BACKGROUND

     Plaintiff Amy Vatnsdal was 58 years old on the date of the hearing before the ALJ.  (Tr.

499).  She has been awarded SSI but appealed denial of disability insurance benefits with respect

to the onset date, which she alleges is May 1996.  (Tr. 499).  She has a high school education and

past work experience doing data entry, mainframe computer operations, and bookkeeping.  (Tr.

500, 508).  She is divorced and now lives alone. (Tr. 507, 499).  She has two adult sons and one

young grandchild.  (Tr. 506, 500).  Plaintiff alleges her disability began after a car accident in

May 1996 and she is disabled by migraines, lumbar, cervical, and thoracic spine injuries,

fibromyalgia, and vision problems.  (Tr. 499).

## II.    MEDICAL RECORDS

Plaintiff was treated at the Pain Assessment and Rehabilitation Center in Edina for

complaints of pain, aching all over, and depression at least as early as May 1994.  (Tr. 137-142,

396-402).  She was involved in a motor vehicle accident in May 1996 and was treated for neck,

back, and leg pain, migraines and depression through October 1997.  (Tr. 130-142, 386-95).

Over this course of time, she was prescribed Paxil, Fiornal, Ultram, and Flexeril.  (Tr. 143).  She

also sought treatment at the New Hope Clinic for migraine headaches in May 1997.  (Tr. 160).

Imitrex resolved her headache on these visits.  (Tr. 159-60).  Plaintiff agreed to try osteopathic

therapy for neck and back pain.  (Tr. 159).

Plaintiff had an MRI of the lumbar spine in September 1996.  (Tr. 407-08).  The MRI

revealed juvenile discogenic disease, moderate degenerative disc disease, moderate stenosis and

a right sided annular tear.  She also had an MRI of the cervical spine which showed degenerative

disc disease with moderate sized central disc herniation, spinal stenosis, right-sided uncinate

spurring, posterior annular tears, and minimal central bulging of the C3-4 and C4-5 discs.  (Tr.

406).

In February 1997, Dr. Berk, a licensed psychologist at the Neurophysiological Institute in

2

Edina, interviewed Plaintiff about her automobile accidents of December 1995 and May 1996. (Tr. 268-69).  Plaintiff reported an increase in migraine headaches as well as shoulder, back, and leg pain.  (Tr. 268).  Psychologically, she reported depression, irritability, and memory problems.

In June 1997, Dr. Anderson, Plaintiff's treating physician, diagnosed myofascial strain/sprain of the cervical, thoracic and lumbar spine, post-traumatic muscle contracture headaches with migraine component, degenerative joint and disc syndrome, and radiating pain with impingement syndrome vs. spine disc protrusion with left leg symptoms.  (Tr. 210).  He noted Plaintiff gets relief from chiropractic treatments and myotherapy.  Dr. Anderson recommended keeping her activity levels at a maximum through exercise, manipulation and medication.  (Tr. 211).

In September 1997, Plaintiff was evaluated for soft tissue injuries by EMG testing.  (Tr. 222-255).  On September 25, 1997, the EMG resulted in abnormal findings indicating greater than normal resting muscle tension, muscle irritability and/or muscle fibers shortening in the lumbar paraspinal musculature.  (Tr. 227).  Dr. Berk, who administered the test, recommended biofeedback assisted neuromuscular re-education.

Plaintiff also underwent a psychological evaluation in September 1997, including an MMPI-2 test.  (Tr. 261-265).  Dr. Berk drew the following conclusions: depressed over loss of function; no tendency toward chemical dependency; no indication of a tendency to malinger; no indication of emotional problems as the primary cause of pain; subscale profile pattern is similar to that of mild closed head injury cases.  (Tr. 262).

Plaintiff was referred for a neuropsychological evaluation in October 1997 at the Courage Center.  (Tr. 144-150).  Dr. Norman Cohen, a licensed psychologist, performed the evaluation.

(Tr. 150).  Plaintiff was noted to have been in four automobile accidents from February 1992 through May 1996.  (Tr. 144).  After her most recent accident, she reported difficulties with memory as well as pain.  The purpose of the evaluation was to determine whether the auto accidents led to any cognitive changes.  (Tr. 144).

Dr. Cohen administered a number of tests.  He noticed that Plaintiff displayed many attentional/memory deficits during testing.  (Tr. 146).  She did, however, appear to work hard and the testing was likely to be accurate.  Her overall intelligence was assessed in the lower half of the average range.  She scored in the high average range for immediate memory.  She scored in the upper half of average on more delayed recall testing.  (Tr. 146).  Additional testing indicated she has difficulty sustaining attention.  (Tr. 147).

Plaintiff's score on the depression inventory fell in the moderate range.  (Tr. 148).  Her score on the anxiety inventory fell in the mildly anxious range.  Dr. Cohen did not believe moderate depression caused her deficit in sustaining attention and concentration but found it difficult to determine whether the automobile accidents caused cognitive changes or whether her problems were truly long standing issues.  (Tr. 149).  He recommended continued medication and psychotherapy as well as cognitive retraining to compensate for attentional problems.  (Tr. 150).

Plaintiff was then referred for additional cognitive testing in November 1997.  (Tr. 168-203).  The test results, including an EEG, were consistent with mild traumatic brain injury, including abnormally slow reaction times to visual stimuli; a global pattern of impaired local and long distance cortical phase and coherence and poor cortical tone; incomplete activation of the brain during mental work; and fairly severe disturbance of binocular vision which may create

4

headaches and avoidance of doing close work.  (Tr. 168).  It was recommended that Plaintiff

should be diagnosed and treated by a neuro-opthamologist or optometrist trained in binocular

disorders.  Plaintiff went to West Metro Opthalmology in August 2000.  (Tr. 342-43).  Dr.

Grosser noted a convergence[1] insufficiency pattern.  He felt the spontaneous worsening and

improving of Plaintiff's diplopia[2] had something to do with her underlying fatigue or near vision

requirements.  He recommended convergence exercises, with prism glasses and surgery as an

option if things continue to deteriorate.

Plaintiff underwent a consultative psychological examination with Dr. Richard Henze in

January 1998.  (Tr. 317-22).  Plaintiff scored in the moderate range for depression on the Beck

Depression Inventory-2.  (Tr. 321).  She scored in the mild range on the anxiety inventory.  Dr.

Henze diagnosed Depressive Disorder NOS with mild anxiety and a GAF of 70[3].  (Tr. 322).  He

found no evidence of problems with intellectual, cognitive, or memory functioning.  He

concluded Plaintiff would have a low average capacity to concentrate with an average ability to

understand instructions and carry out tasks with reasonable persistence and pace.  (Tr. 322).  He

also concluded Plaintiff's depression might constrict, but not seriously limit, her ability to

respond to co-workers and supervisors and her ability to tolerate normal stress.

In July 1998, Plaintiff was involved in a motor vehicle accident which caused neck pain,

---

[1] Convergence is the direction of the visual lines to a near point.  Stedman's Medical Dictionary 406 (27th ed. 2000).

[2] Diplopia is perceiving a single object as two objects (double vision).  Stedman's at 507.

[3] A global assessment of functioning "GAF" score of 70 indicates mild symptoms or some difficulty in social, occupational, or school functioning but generally functioning pretty well.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders Fourth Edition Text Revision 34 (2000)(DSM-IV-TR).

headaches, and back pain.  (Tr. 383).  She described the pain as "constant, achy, and fatiguing."

Her headaches became more frequent and intense after the accident.  Upon examination, Plaintiff

had muscle spasms with active trigger points, and decreased range of motion but was otherwise

normal.  (Tr. 384).  Dr. Anderson ordered X-rays and recommended chiropractic treatment,

myotherapy, and continuation of the same medications.

Plaintiff was involved in another auto accident in December 1998.  (Tr. 379).  She

described her pain as "fatigue and deep achy sensations into her thighs" with constant headaches

since the accident.  She noted that her daily activities were greatly affected by pain, fatigue, and

headaches.  X-rays were ordered again and Plaintiff was continued on Fiornal with codeine,

Ultram, and Flexeril for pain and headaches. (Tr. 381).

Plaintiff was in another auto accident on January 26, 1999.  (Tr. 375).  She experienced a

significant increase in pain throughout her body.  Dr. Anderson recommended continued

chiropractic care and pain medication.  (Tr. 377).

In April 1999, Dr. Anderson wrote a letter (addressed To Whom It May Concern) in

which he stated Plaintiff was still disabled from work.  (Tr. 374).  He noted she had been off

work since June 1998.  Specifically, he stated:

> It is my opinion that this patient has been temporarily disabled
> since June 28, 1998, as a result of the injuries that she has
> sustained in the accidents of June 28, 1998 and December 11,
> 1998.  The examination findings are consistent with her pain
> complaints, she has muscle spasm, loss of range of motion, and
> trigger point formation within the various structures of the mid
> back as well as the low back.  She has exquisite tenderness elicited
> over the occipital nerves, which again, are consistent with her
> headaches.

Dr. Anderson wrote another letter in March 2000 in which he opined Plaintiff continued to be

disabled from returning to any type of gainful employment as a result of headaches and back pain radiating into her legs. (Tr. 373).

Plaintiff was involved in another auto accident on October 26, 2000 and was subsequently examined by Dr. Anderson in mid-November. (Tr. 370). She experienced immediate neck and back pain after the accident and had severe headaches the following week. She took Vicodin and Percocet, which reduced the pain enough so she could function minimally. Until this accident, she had been doing better since the last accidents. (Tr. 371). Dr. Anderson noted she had not worked since May 1996. He recommended physical therapy and continued Plaintiff on Percocet for more severe pain and Vicodin for daily pain. (Tr. 372).

In January 2001, Plaintiff rated her pain as 8 or 9 out of ten with some improvement toward the afternoon. (Tr. 363). She was using 2-3 Vicodin a day. She also took Percocet when she experienced significant headaches, about four times a month. Upon examination, Dr. Anderson noted improvement verified by increased range of motion. (Tr. 364, 361). He recommended stretching exercises, increasing endurance with walking and mild weightlifting, and massage therapy.

In April 2001, Plaintiff's pain and headaches increased. (Tr. 359). Dr. Anderson prescribed Covera-HS, Percocet for neck and back pain as well as for headaches, and daily Vioxx. (Tr. 360). He also recommended that Plaintiff exercise on a regular basis to the best of her ability.

In May, Plaintiff reported that stretching and walking daily was helpful as long as she did not overdo the duration or intensity. (Tr. 357). Dr. Anderson noted that she "continues to experience episodes of exacerbation followed by periods of less intense symptoms. This is a

common feature of her condition."  (Tr. 358).  He recommended continued chiropractic care and daily exercise.

In August 2001, Plaintiff continued to have pain, reduced somewhat by Vicodin.  (Tr. 355).  She had difficulty sleeping due to pain.  Dr. Anderson noted Plaintiff was using her medication appropriately and sparingly so he continued to prescribe Vicodin and Percocet.  (Tr. 356).  Several months later, Plaintiff reported having good days with substantial improvement in energy and strength and bad days where her symptoms flared-up.  (Tr. 353).  In November, when she had an increase in pain for two weeks, Dr. Anderson switched her to Percocet exclusively. (Tr. 351).  She was doing better the next month.  (Tr. 349).

However, in January 2002, Plaintiff had a significant increase in pain.  (Tr. 347).  She was taking 3-4 Percocet a day and one cyclobenzaprine.  Dr. Anderson noted: "at higher doses of oxycodone, she does have significant night sweats."  (Tr. 347).  In March, Dr. Anderson switched Plaintiff from Percocet back to Vicodin.  (Tr. 346).  Plaintiff's cervical range of motion and lumbar extensions were substantially limited.

Plaintiff began treating at Fremont Community Health Services in June 2002 when she could no longer go to Dr. Anderson due to an insurance change.  (Tr. 428).  Plaintiff reported pain at a level of 10 on a scale of 1-10, having been out of pain pills for three days.  Upon examination, she had a full range of motion and normal strength.

In August 2002, Plaintiff was treated at Fremont Community Health Services for "management of chronic pain and fibromyalgia."  (Tr. 425).  Plaintiff was noted to be in no acute distress and her pain controlled on chronic opioid therapy.  Plaintiff stated without medication, her pain is at a level of nine on a scale of 9-10 but with Vicodin her pain is at a level of four.

Plaintiff agreed to participate in the MAPS chronic pain program.

Plaintiff reported having six migraines in the month of August.  (Tr. 424).  In October 2002, Plaintiff reported her pain was decreased with Vicodin.  Without Vicodin, she stated she would just stay in bed all day.  (Tr. 421).  In November, she reported her pain as 3-4 on a scale of ten on her best day and 8 on her worst day.  (Tr. 420).

In February 2003, Plaintiff described base-level pain as a 5 on a scale of one to ten.  (Tr. 417).  With Vicodin, she rated her pain as three.  Her chronic pain and depression were described as "well-controlled on medication."  In May 2003, Plaintiff agreed to try lumbar and cervical injections at the pain clinic.  (Tr. 414).  She was continued on Vicodin.

Plaintiff was referred to the Interventional Pain Center for evaluation of her pain in April 2003.  (Tr. 411-412).  Plaintiff described headaches, depression, and multi-level pain at a level of 7-8 out of 10.  Her medications at that time were Ibuprofen, Paxil, Vicodin, Robaxin, Estrogen, Provera, Detrol and Traxodone.

In September 2003, Plaintiff underwent a psychological consultative examination with Dr. Diane Henze.  (Tr. 441-45).  Dr. Henze noted that Plaintiff reported significant depression with poor appetite, low energy, and low self-esteem.  (Tr. 444).  Plaintiff also reported poor concentration, which was supported by the results of her testing.  Dr. Henze found Plaintiff's prognosis to be guarded, with a GAF of 65.  She opined: "this claimant has below average abilities to concentrate and understand instructions.  I believe she could carry out simple tasks at a reasonable pace, but with inadequate persistence.  I believe she would respond appropriately to co-workers and supervisors, but have difficulty tolerating stress in the work place."  (Tr. 445).

## III.    PROCEDURAL BACKGROUND

A. **Administrative Process**

Plaintiff filed an application for social security disability benefits on April 15, 2003.  (Tr. 52-54).  The application was denied initially and upon reconsideration.  (Tr. 22-25).  Plaintiff requested a hearing before an Administrative Law Judge.  (Tr. 40).  A hearing was held before Administrative Law Judge Diane Townsend-Anderson on February 25, 2005.  (Tr. 496).  On July 29, 2005, the ALJ issued an unfavorable decision.  (Tr. 20).  The Social Security Administration Appeals Council denied a request for further review.  (Tr. 8-10).  The denial of review made the ALJ's findings the final decision of the defendant.  42 U.S.C. §405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. § 404.981.

B. **Hearing before the Administrative Law Judge**

At the hearing before ALJ Diane Townsend-Anderson on February 25, 2005, Plaintiff testified that her disability goes back to an accident in May 1996.  (Tr. 499).  She testified she has been unable to work a full-time job since then because she is in constant pain.  (Tr. 500).  She moved to a one level trailer house to avoid stairs.  (Tr. 501).  Her pain is from the chin down and she has headaches.  She takes an antidepressant, pain medication and a muscle relaxer.  Weather changes increase her pain.  She testified that when the weather is nice she is much better but when the weather changes she is "down."  (Tr. 509).  Bending and using her hands above her also increases her pain.  (Tr. 509-10).

Plaintiff estimated she can stand for fifteen minutes and walk several blocks before resting.  (Tr. 501-02).  She can sit for 10 - 15 minutes before she has to get up.  (Tr. 502).  She can lift 10-15 pounds.  Her vision becomes blurry after reading approximately ten pages.  To relieve pain, she changes from sitting, standing and walking and also goes to sleep.

Plaintiff testified that her condition has gotten worse with each of eight car accidents which occurred in the years 1992, 1994, 1996, 1998, 1999, 2000 and 2003.  (Tr. 503).  Plaintiff testified she received lost wages for 1996-1998 from a lawsuit involving the 1996 car accident.

Plaintiff testified that she gets migraine headaches, on average, three times a week.  (Tr. 504).  She is allowed two Vicodin in the day and takes one pill in the morning and splits the other one in the afternoon and at night.  (Tr. 504).

Plaintiff testified that during the day she does some cleaning or baking.  (Tr. 504).  She used to do embroidery and go bowling but no longer does.  (Tr. 505).  She had been to a play during the last week with a girlfriend.  She goes to church, usually once a week.  (Tr. 505).

Plaintiff testified that she started working at age eighteen and worked from then until 1996, even when her children were young.  (Tr. 508).  She does not have experience with "the most up-to-date computers and programs."  (Tr. 511).

A vocational expert, Steve Bosch, testified at the hearing.  (Tr. 511).  He first responded to a hypothetical question involving a fifty-year-old woman, with a high school education, who is on medications with no side effects, and is impaired by diminished vision, chronic myofascial pain, possible fibromyalgia, status post multiple motor vehicle accidents, who has headaches and degenerative disc disease.  Assuming such a person could lift and carry twenty pounds occasionally, 10 pounds frequently; cannot work in temperature and humidity extremes; cannot work at heights, on ladders or scaffolds; cannot do over shoulder work; must have a sit/stand option; cannot do work requiring constant fine visual acuity; and can only bend, stoop, crouch, crawl or twist occasionally, Mr. Bosch testified such a person could perform Plaintiff's past work as an accounting clerk or bookkeeping assistant, office helper and file clerk.  (Tr. 512-13).

11

The ALJ modified the hypothetical question to assume a similar individual who could only lift and carry ten pounds occasionally and five pounds frequently. Mr. Bosch testified that such a person could perform Plaintiff's past work as an accounting/bookkeeping clerk and could perform other jobs, such as information clerk. (Tr. 513-14).

For a final hypothetical, the ALJ asked Mr. Bosch to assume a similar individual who, due to pain, would be absent from work more than four times a month, and due to pain, would be unable to attend to tasks at hand. (Tr. 514). Mr. Bosch testified that such a person could not work.

**B.      The ALJ's Decision**.

As an initial matter, the ALJ noted Plaintiff had filed a previous application for benefits which was denied in February 1998. Because the prior application was not reopened, the ALJ determined "the established alleged onset date in this matter is February 10, 1998." (Tr. 15). The ALJ found the claimant has not engaged in substantial gainful activity since February 10, 1998. 20 C.R.F. §404.1520(b). (Tr. 16).

At the second step, the ALJ found that the claimant has severe impairments of decreased vision, chronic myofascial pain syndrome, history of motor vehicle accidents, headaches, and degenerative disc disease. (Tr. 17, 19). 20 C.F.R. §404.1520(c). The ALJ noted that the claimant suffered depression in the past but was not treated for depression in the period of disability she alleges. (Tr. 17). Furthermore, the claimant did not allege she has a disabling mental impairment. She was not diagnosed with dysthymic disorder until 2003. The ALJ concluded Plaintiff did not have a medically determinable mental impairment between February 10, 1998 and December 31, 2000, the date last insured. (Tr. 17).

The third step in the evaluation process requires the ALJ to consider whether the claimant has an impairment or combination of impairments that meet or equal an impairment listed in Appendix 1 of this subpart of the regulations. 20 C.F.R. §404.1525. The ALJ found that claimant's impairments do not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 17).

Step four requires the ALJ to first determine Plaintiff's residual functional capacity ("RFC") and then consider whether the claimant can still do work she has done in the past. 20 C.F.R. § 404.1520(e). Determination of RFC requires consideration of the evidence taken as a whole, including not only objective medical evidence, but also the subjective complaints expressed by the claimant. Polaski v. Heckler, 739 F.2d 1320, 1321-1322 (8th Cir. 1984). In evaluating those subjective complaints, the ALJ must consider the objective medical evidence or its absence, along with prior work record and observations by third parties and treating and examining physicians. Polaski, 739 F.2d at 1322.

The ALJ determined claimant has the residual functional capacity to lift and carry ten pounds frequently and twenty pounds occasionally; but she cannot tolerate temperature extremes, cannot work at heights, on ladders, or perform over the shoulder work; she requires a sit/stand option; she cannot perform constant visual work; and she can only occasionally bend, stoop, or twist. (Tr. 20).

The ALJ noted that three state agency physicians were of the opinion that claimant could lift and carry ten pounds frequently and twenty pounds occasionally and she granted those opinions some weight. (Tr. 17). Although claimant's chiropractor kept her off work until December 1997, this was before the alleged onset date of February 10, 1998, so the ALJ found it

13

not relevant.  (Tr. 17).

The ALJ reviewed the opinion of claimant's treating physician, Dr. Anderson, dated April 1999.  (Tr. 18).  Dr. Anderson opined that the claimant was temporarily disabled from June 28, 1998 through March 2000.  (Tr. 18).  The ALJ did not place great weight on this opinion because the objective findings in the record did not support it and Dr. Anderson's clinical notes did not "ascribe such severity" where claimant's treatment was largely conservative. Furthermore, the ALJ did not find short-term work release forms persuasive because they were not permanent or long term work restrictions.

The ALJ next considered Plaintiff's subjective complaints of pain.  She found that claimant's level of activity is inconsistent with total disability where she performs light housework, bakes, and goes to church on a regular basis. (Tr. 18).

The ALJ found that Plaintiff was prescribed medication appropriate for her impairments but nothing in the record established that she failed to receive significant relief with the use of medication.  (Tr. 18).  Her chronic pain was described as well-controlled and claimant reported Vicodin helps her with her activities of daily living.

The ALJ considered the fact that the claimant had not worked since her alleged onset date.  However, she found evidence that claimant initiated several lawsuits related to her car accidents and received a financial award which affected her motivation to rejoin the workforce. The ALJ concluded the claimant's testimony was not entirely credible.  (Tr. 18).

The ALJ determined that Plaintiff is not precluded by her impairments from doing her past relevant work as a bookkeeping assistant, officer helper, and file clerk.  20 C.F.R. §404.1520(e).   (Tr. 20).  Thus, the ALJ found claimant was not under a disability, as defined

under the Social Security Act, for the relevant time period.  20 C.F.R. § 404.1520(f).  (Tr. 20).

## IV.    STANDARD OF REVIEW

Judicial review of defendant's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole.  42 U.S.C. §405(g); Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994).  Substantial evidence is enough evidence that a reasonable person might accept as adequate to support a conclusion. Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  Where such evidence exists, a court is required to affirm defendant's factual findings. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  On the other hand, the analysis must include evidence in the record which detracts from the weight of the evidence supporting the ALJ's decision. Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). Thus, the court must consider the weight of the evidence in the record and apply a balancing test to evidence which is contrary.  Id.

The Court is required to review the administrative record as a whole and to consider: 1) the credibility findings made by the ALJ; 2) the education, background, work history, and age of the plaintiff; 3) the medical evidence provided by treating and consulting physicians; 4) the plaintiff's subjective complaints; 5) any corroboration of plaintiff's impairments by third parties; and 6) testimony of vocational experts based upon proper hypothetical questions setting forth plaintiff's impairments.  Cruse v. Bowen, 867 F.2d 1183 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

However, in reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The possibility that the Court could draw two inconsistent conclusions from the same record does not

prevent a particular finding from being supported by substantial evidence.  <u>Culbertson v. Shalala</u>,

30 F.3d 934, 939 (8th Cir. 1994).

## V.    DISCUSSION

Plaintiff contends the ALJ erred in a number of respects.  First, she argues the ALJ failed

to give proper weight to the opinion of her treating physician, Dr. Anderson.  Second, she argues

the ALJ erred in concluding Plaintiff did not suffer medically determinable impairments of

depression and chronic pain syndrome.  Third, the ALJ did not carefully consider the work

demands of Plaintiff's past relevant work and erred in relying on the vocational expert's

testimony that Plaintiff could perform her past relevant work.  Fourth, the ALJ erred in finding

Plaintiff was not disabled from the date of the alleged onset through the date of the hearing.

Defendant asserts that the ALJ's decision is supported by the record as a whole and that

the ALJ reasonably weighed the medical evidence.  Defendant asserts the ALJ properly relied on

the vocational expert's opinion because it was consistent with the Dictionary of Occupational

Titles ("DOT").

### A.    <u>Medical Opinions</u>

Plaintiff contends Dr. Anderson's treatment notes support her opinion that Plaintiff was

disabled from any gainful employment.  Defendant argues Dr. Anderson's notes do not contain

objective findings to support disability.  Defendant also asserts Dr. Anderson's opinion was

inconsistent with the opinions of three state agency physicians.

Medical opinions are evaluated under the framework described in 20 C.F.R. §404.1527.

In according weight to medical opinions, the ALJ should consider the following factors:  (1) the

length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3)

the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the

record as a whole; and (5) whether the treating physician is also a specialist.  20 C.F.R.

§404.1527(d).

A treating physician's opinion is typically entitled to controlling weight if it is well-

supported by "medically acceptable clinical and laboratory and diagnostic techniques and is not

inconsistent with other substantial evidence in the record."  Leckenby v. Astrue, 487 F.3d 626,

632 (8th Cir. 2007) quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000); 20 C.F.R. §

404.1527(d)(2).  The ALJ may credit other medical evaluations over a treating physician when

such other opinions are supported by better or more thorough evidence.  Prosch v. Apfel, 201

F.3d 1010, 1013 (8th Cir. 2000).

Dr. Anderson's opinion that Plaintiff was temporarily disabled since June 28, 1998, is

supported with the following statement:

> The examination findings are consistent with her pain complaints,
> she has muscle spasm, loss of range of motion, and trigger point
> formation within the various structures of the mid back as well as
> the low back.  She has exquisite tenderness elicited over the
> occipital nerves which, again, are consistent with her headaches.

(Tr. 374).  Although the objective findings may be minimal, Defendant is incorrect in concluding

there are no objective findings to support Dr. Anderson's opinion.  The question, then, is

whether Dr. Anderson's opinion is inconsistent with other substantial evidence in the record.

After Plaintiff's car accident in July 1998 she described her pain as "constant, achy, and

fatiguing." Upon examination, Plaintiff had muscle spasm with active trigger points, and

decreased range of motion but was otherwise normal.  (Tr. 384).  Plaintiff was treated by a

chiropractor, a myotherapist, and with pain medication and a muscle relaxant.

Plaintiff had examination findings of muscle spasm, tenderness, and decreased range of motion on December 14, 1998, several days after she had been involved in another accident. (Tr. 379-80).  Her neurological examination produced normal results.  Her muscle strength, coordination, and reflexes were normal.  The examination findings were very similar after Plaintiff was involved in another car accident in January 1999.  (Tr. 375-76).  After Plaintiff's involvement in a car accident in October 2000, examination showed decreased range of motion and trigger points but muscle spasm was not mentioned.  Again, nerve function, muscle strength, and reflexes were normal. (Tr. 371-72).

When Plaintiff began treating at Fremont Community Health Services in June 2002, her examination revealed full range of motion and normal strength.  (Tr. 428).  In August 2002, it was noted that Plaintiff was being treated for chronic pain and fibromyalgia, although, the record does not indicate when fibromyalgia was diagnosed.  (Tr. 425 and Tr. 156 "fibromyalgia by history.")  Plaintiff had full range of motion again in December 2002 but had palpable tenderness in the cervical, thoracic, and lumbar regions.  (Tr. 419).

There is some inconsistency in the record with respect to whether Plaintiff was suffering from muscular strain/sprain injuries from her car accidents, which Dr. Anderson found to be consistent with Plaintiff's examinations, or whether Plaintiff was instead suffering from fibromyalgia (or both).  The record indicates Plaintiff's range of motion was substantially limited in March 2002 when she last saw Dr. Anderson but she had a full range of motion in June, August, and December 2002, when she began treating at Fremont Community Health Services.

Defendant argues Dr. Anderson's opinion is inconsistent with the opinions of three state agency physicians.  The first agency physician reviewed the record in January 1998, apparently

18

on an earlier application for benefits, and did not review all of the pertinent medical records. (Tr. 306-313).  Two state agency physicians reviewed the medical records in 2003 and opined Plaintiff had the residual functional capacity to do light work where the objective medical findings were limited to decreased range of motion of cervical and lumbar spine and generalized tenderness to palpation.  (Tr. 432-440).  These physicians did not agree with Dr. Anderson's opinion that Plaintiff would be disabled from any type of employment based on these limited objective findings.  (Tr. 438).  While this might seem to be a reasonable conclusion, it is not based on better or more thorough evidence than that relied on by Dr. Anderson, it is based on the same evidence.  However, the ALJ did not grant these opinions controlling weight.[4]  Whether Dr. Anderson's opinion is entitled to controlling weight depends on how well it is supported by the record as a whole, including factors beyond the objective medical findings discussed above.

There is substantial evidence that Plaintiff's symptoms were often reduced and/or "well controlled" by medication.  In July 1998, Dr. Anderson noted Plaintiff would continue on her present medications, Ultram and a muscle relaxant, as "these seem to be working well for her at this time."  (Tr. 385).  In January 1999, Plaintiff was also taking Fiornal with codeine.  (Tr. 376). Dr. Anderson noted: "these medications seem to be giving the patient a window of opportunity with this current pain syndrome."  (Tr. 377).  In November 2000, Dr. Anderson noted that by using medications and home exercises, Plaintiff had been doing much better since July 2000 (until another motor vehicle accident in October.)  Dr. Anderson renewed Plaintiff's

---

[4]  The ALJ stated she granted these opinions "some" weight.  (Tr. 17).  This is consistent with the fact that the ALJ included additional limitations (including sit/stand option) in Plaintiff's residual functional capacity beyond the limitations suggested by the state agency physicians.

prescriptions for Vicodin and Percocet, which he noted Plaintiff had used sparingly.  (Tr. 372).

The next month, Plaintiff reported the medications drastically improve her capacity to function.  (Tr. 368).  She also said chiropractic care was helpful.  (Tr. 365, 368).  She did, however, say her fatigue was debilitating.  Dr. Anderson renewed Plaintiff's prescription for Vicodin (Tr. 365) see also Tr. 364 (using Percocet only when headache is more severe, controlling the overall pain with Vicodin); Tr. 361 (continues to improve, chiropractic care has been providing important pain relief); Tr. 359 (weekly chiropractic care going quite well); Tr. 357-58 (daily exercise is helpful, Vicodin and Percocet allow her to be considerably more active than without the medications, important to maintain her fitness levels); Tr. 355-56 (Vicodin and Percocet prescribed for migraines and "flareups") Tr. 351 (taken off Vicodin to use Percocet exclusively, "it is effective for her pain symptoms") Tr. 349 (Percocet is more effective than Vicodin, also taking Flexeril at night); Tr. 347 (taking 3-4 Percocet per day and cyclobenzaprine once daily "to significantly reduce her pain and spasms"); Tr. 346 (switched back to Vicodin which is less expensive and equally as effective as Percocet).  Tr. 414-429 (Fremont clinic continued Plaintiff on Vicodin through May 2003); Tr. 420 (one Vicodin typically relieves the headache).

Plaintiff's continued use of narcotic pain medication is not consistent with the ALJ's opinion that Plaintiff's treatment was largely conservative.  Common sense would imply long term use of narcotic pain medication would be a last resort to treat chronic pain, especially where objective medical findings were minimal.  However, the medication was effective to reduce Plaintiff's pain in half (on a scale of 1-10), no side effects were reported, and Dr. Anderson reported Plaintiff used the medication appropriately.

It would be reasonable for the ALJ to conclude the effectiveness of treatment is inconsistent with Dr. Anderson's opinion of total disability. Additionally, Dr. Anderson frequently encouraged Plaintiff to get as much exercise as she could and Plaintiff reported this was helpful if she did not overdo it. There is sufficient evidence in the record to support the ALJ's decision not to grant Dr. Anderson's opinion controlling weight.

### B.    <u>Mental Impairments</u>

Plaintiff alleges the ALJ erred in concluding Plaintiff does not suffer a medically determinable mental impairment because the record indicates Plaintiff was diagnosed with depression and chronic pain syndrome. Defendant argues that diagnosis of depression and chronic pain does not indicate Plaintiff has severe mental impairments.

The ALJ erred when she stated "...the record does not indicate that the claimant had depression or any other affective disorder between February 10, 1998 and December 31, 2000, the date the claimant was last insured. Approximately ten days prior to the beginning of the relevant time period in this case, Plaintiff underwent a psychological consultative examination. (Tr. 317). Plaintiff brought a copy of her Psychological Report from October 1997 to the consultative exam. Dr. Heinze reviewed that report and another report from September 1997. The reports indicated that Plaintiff should "continue psychotropic medications (and) continue psychotherapy." (Tr. 318). Dr. Richard Heinze diagnosed depressive disorder, NOS, with mild anxiety symptoms and "much stated relation to physical incapacitation/symptomatology." (Tr. 322). He did not specifically diagnose chronic pain syndrome. Under Axis III of the DSM-IV, which describes physical conditions that play a role in development, continuance, or exacerbation of Axis I and II Disorders, Dr. Heinze noted: "defer to current medical

evaluation/examination results" He found Plaintiff's GAF to be 70, indicating only mild symptoms.  DSM-IV, supra n.3.

 Although Dr. Anderson notes depression secondary to "pain complex" or "ongoing pain syndrome," it is clear from Dr. Anderson's treatment notes as a whole that he believed Plaintiff's pain to be consistent with physical injuries suffered in numerous car accidents.  The records from Fremont Community Health Services indicate that in 2002 Plaintiff was treated for chronic pain but there is no diagnosis for chronic pain syndrome under Axis III of the DSM-IV.  (Tr. 465-487).  Based on this record, it was appropriate for the ALJ to consider Plaintiff's complaints of pain as a physical, and not a mental impairment.

The record indicates Plaintiff was treated for depression with Paxil throughout the relevant time period.  However, she only reported increased depression on one office visit in December 2001 and when she ran out of Paxil for two weeks in December 2002.  (Tr. 349, 419).  On most office visits, Plaintiff did not mention depression.  The last record of psychotherapy is from December 1997.  (Tr. 213).  There is nothing in the record to indicate that she continued psychotherapy from 1998 through 2000.

A mental impairment is severe if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.1521(a).  Defendant correctly points out that a diagnosis of depression is not sufficient to establish a severe mental impairment.  If depression does not significantly limit an individual's ability to perform basic work activities, it is not a severe impairment.  Evidence that Dr. Heinze assessed Plaintiff to have a GAF of 70, Plaintiff was effectively treated with Paxil, and Plaintiff did not seek psychotherapy during the relevant time

period support the ALJ's determination that Plaintiff's depression was not a severe impairment.[5]

## C.     Residual Functional Capacity

Plaintiff argues the ALJ failed to formulate a proper credibility finding and "made errors of law against substantial evidence in finding that Plaintiff was not disabled."  These arguments will be addressed together to determine whether the ALJ's decision concerning Plaintiff's residual functional capacity is supported by substantial evidence.  Defendant contends medical source statements, conservative and effective treatment, and Plaintiff's daily activities support the ALJ's finding that Plaintiff was not fully credible.

When a Plaintiff alleges a subjective complaint such as pain, the ALJ must assess the credibility of Plaintiff's subjective complaints by considering Plaintiff's daily activities; duration, frequency and intensity of symptoms, precipitating and aggravating factors[6], type, dosage and effectiveness and side effects of medication; and other treatments.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  This Court must also consider the education, background, work history, and age of the plaintiff, the medical records, and any corroboration of

----

[5]  Because the ALJ did not err in finding Plaintiff's depression was not a severe impairment during the relevant time period, this Court need not address Plaintiff's argument that "based on plaintiff's showing...that, indeed, she has suffered mental impairments at since at least the alleged February 10, 1998 onset date, the ALJ is required to follow the dicta of SSR 82-62...past work experience must be considered carefully... [and provide] documentation in regard to issues such as strength, endurance, *mental demands* and other relevant job requirements."

[6]  The ALJ did not specifically discuss precipitating and aggravating factors, but apparently took Plaintiff's testimony that weather changes aggravate her pain into account when she including a limitation in Plaintiff's residual functional capacity for the inability to tolerate temperature and humidity extremes.  Furthermore, the record indicates that Plaintiff generally attributed increases in frequency and severity of pain to the automobile accidents she was involved in during the relevant time period.

plaintiff's impairments by third parties.[7]   <u>Cruse v. Bowen</u>, 867 F.2d 1183 (8th Cir. 1989).

Plaintiff was fifty-one years old at the date of alleged onset, February 10, 1998.  She has a high school education and a substantial work history in data entry and with mainframe computer operations.  (Tr. 110 ).  Plaintiff was involved in a car accident in 1992 but continued to work, at least part-time, until May 1996 when she was involved in another car accident.

The ALJ did not find Plaintiff's substantial work history to support her credibility but instead found the fact that Plaintiff received an award from a lawsuit related to her May 1996 car accident indicated she was not motivated to work in those years.  The ALJ erred by using such evidence to suggest Plaintiff simply lacked motivation to work.  Plaintiff's otherwise long and steady work history supports her credibility.

The medical records and opinions of the treating and consulting physicians for the relevant time period have been discussed above.  In sum, the objective findings which support Plaintiff's allegations of pain are minimal but there are objective findings of decreased range of motion, tenderness with palpation, and muscle spasm. Additionally, none of Plaintiff's treating physicians questioned whether she suffered migraine headaches.  However, Plaintiff's testimony regarding the severity of her pain is not entirely credible because it is inconsistent with the treatment records insofar as medication, chiropractic care, and light exercise improved Plaintiff's pain and ability to function, as described above.

The last factor in evaluating Plaintiff's subjective complaints is her daily activities. Defendant alleges Plaintiff's activities of light house cleaning, cooking, shopping, visiting friends, going to plays and attending church regularly support the ALJ's determination that her

---

[7] Plaintiff did not offer testimony of any third parties in her support.

subjective complaints are not fully credible.  There is other evidence of Plaintiff's daily activities in the record.

Dr. Anderson frequently encouraged Plaintiff to get as much exercise as she could and Plaintiff reported doing daily stretching and light exercise.  (Tr. 357, 355, 349, 359, 361 ). Plaintiff went to a chiropractor as much as three times a week, massage twice a week, and myotherapy twice a week, although not necessarily during the same time period.  (Tr. 363, 381, 385, 365 ).  The ability to attend and engage in these treatments are consistent with someone whose body pain and migraines are reduced and/or controlled by medication.  Plaintiff's daily activities are not consistent with her testimony that severe pain prevents her from being able to sit, stand, or walk for more than ten or fifteen minutes at a time.  The ALJ's credibility finding is supported by substantial evidence in the record including minimal objective findings, effective treatment that reduced pain, and daily activities inconsistent with Plaintiff's subjective complaints.

**D.**     **Plaintiff's Past Work and Vocational Expert's Testimony**

Plaintiff alleges the ALJ erred by not including a finding as to the physical and mental demands of Plaintiff's past work when the ALJ determined Plaintiff's residual functional capacity.  Plaintiff relies on SSR 82-62 which provides:

> In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact:
>
> 1.  A finding of fact as to the individual's RFC.
> 2.  A finding of fact as to the physical and mental demands of the past job/occupation.
> 3.  A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

25

The ALJ's decision that Plaintiff did not suffer a severe mental impairment is supported by the record, therefore, the Court will consider only the physical demands of Plaintiff's past work. Defendant contends that although the ALJ could have articulated her findings with more specificity than to simply state she relied on the opinion of the vocational expert, there is sufficient information in the record concerning the demands of Plaintiff's past work. Defendant correctly cites SSR 82-62 for the proposition that the claimant is the primary source of such information.

Plaintiff described her past relevant work as a computer operator/scheduler as including data entry and tape librarian for a main frame computer. "I worked only on the mainframe computer." (Tr. 82). This job required carrying forty pound boxes of computer forms, sitting two hours, walking three hours, and standing three hours. (Tr. 82).

Plaintiff described her bookkeeping job as "data entry; accounts payable on personal computer; billing invoices; answered phones." (Tr. 83). She noted that she carried boxes of forms and frequently lifted ten pounds, occasionally twenty pounds. She spent two of six hours a day walking, forty-five minutes standing, and three hours sitting.

The ALJ's discussion of Plaintiff's past relevant work is as follows:

> The evidence in this case establishes that the claimant has past relevant work as an accounts payable clerk and a general office clerk. (Exhibit 9-E)...The impartial vocational expert testified that based upon the claimant's residual functional capacity, the claimant could return to her past relevant work as bookkeeping assistant, office helper and file clerk performed by the claimant. The undersigned has verified that the testimony of the vocational expert does not conflict with information provided in the Dictionary of Occupational Titles as required by Social Security Ruling 00-4p. Based on the credible and persuasive testimony of the vocational expert, the undersigned finds that claimant is able to perform her past relevant work.

(Tr. 19).  See also Tr. 20 (claimant is not precluded from performing past work as bookkeeping assistant, office helper and file clerk).  Exhibit 9-E, which the ALJ referred to, is the vocational analysis completed by the vocational expert.  (Tr. 110).  This report indicates that Plaintiff's past relevant work is consistent with the DOT description of Data Entry Clerk, 203.582-054, sedentary and semi-skilled work.  Her other past work is consistent with the DOT description of General Office Clerk, 209.562-010, light and semi-skilled work.  The vocational analysis does not mention past relevant work as a file clerk, although the vocational expert testified Plaintiff had such past relevant work and cited DOT code 206.387-034.  (Tr. 513).

There is sufficient evidence in the record for the ALJ to establish the requirements of past work Plaintiff performed, which Plaintiff described as data entry, accounts payable, billing invoices on a computer, and answering phones.  The vocational expert testified this work is consistent with the DOT title Accounts Payable Clerk[8] and the ALJ confirmed that the DOT was consistent with the vocational expert's testimony.  The expert testified there are 40,000 accounting and bookkeeping clerks in the state of Minnesota.  (Tr. 512-13).  Plaintiff's past work is also consistent with the DOT title, General Office Clerk[9] (or office helper), Code 209-562-

---

[8]  An Accounting Clerk (encompassing Accounts Payable Clerk and others) maintains accounting records, compiles and sorts documents, verifies and posts details of business transactions, uses a calculator, typewriter or computer.  DOT 216.482-010.  Although this is consistent with Plaintiff's description of her past work, the vocational expert did not cite this particular DOT code, instead, he cited the code for Data Entry Clerk.  (Tr. 110 "Accounts Payable Clerk 203.582-054") This error is harmless where Plaintiff described her work as performing data entry and accounts payable.

[9]  A General Office Clerk writes, types or enters information into a computer, using keyboard to prepare correspondence, bills, statements...proofreads records or forms..sorts and files records..addresses envelopes or packages...answers telephones...photocopies.  DOT 209.562-010.

27

010.

Plaintiff also had past work as a "tape librarian"for a mainframe computer.  There is a title for "Tape Librarian" in the DOT, code 206-367-018.  According to the Dictionary of Occupational titles, a tape librarian classifies, catalogs and maintains a library of computer tapes. "May work in computer room operations, performing tasks such as loading and removing printouts and reels of tape."  A tape librarian performs work similar to a file clerk who, instead of tapes, files correspondence, cards, invoices and receipts and locates and removes material when requested.  DOT code 55321.  There was sufficient evidence in the record for the ALJ to understand the requirements of Plaintiff's past work as a tape librarian and to find Plaintiff's past work as a tape librarian consistent with the DOT title File Clerk, code 206.387-034.

However, Plaintiff argues the jobs described by the vocational expert as consistent with her past work "all require nearly constant close visual work."  Plaintiff points out the RFC states "she cannot perform constant visual work."  At the hearing, Plaintiff's counsel asked the vocational expert whether visual acuity would be necessary with the bookkeeping and account clerk jobs.  (Tr. 514).  The expert testified that visual acuity would be necessary with any of the jobs he cited but he felt, given the specifics of the ALJ's hypothetical with regard to vision, the jobs would fit.  (Tr. 514-15).

The first hypothetical the ALJ posed stated in part "where there would be no requirement for constant fine visual acuity such as microscope work or staring into a computer screen all day."  (Tr. 512).  The second hypothetical contained the same restriction but reduced the amount of lifting the person could do.  (Tr. 513).  The vocational expert did not explain whether an accounting or bookkeeping clerk (or data entry clerk) would "stare into a computer screen all

day."  The DOT, however, suggests such a person would perform constant visual work of that

nature.  The same is true for a General Office Clerk.  The record is insufficient to explain why

the vocational expert thought someone who cannot perform constant fine visual work, such as

staring into a computer screen all day, can perform Plaintiff's past relevant work.  The ALJ can

not rely on the vocational expert's testimony where it conflicts with the DOT.  Jones ex rel.

Morris v. Barnhart, 315 F.3d 974, 979 (8th Cir. 2003).

Plaintiff's residual functional capacity also limits her to lifting ten pounds frequently and

twenty pounds occasionally with a sit/stand option.  Therefore, she cannot perform her past

relevant work as a file clerk (tape librarian) where she was required to lift forty pound boxes.

However, SSR 82-61 provides that a person should be found not disabled if she retains the

capacity to perform the functional demands of the job as ordinarily required by employers

throughout the national economy.  The DOT descriptions can be relied upon to define the job as

it is usually performed.  SSR 82-61.

The DOT describes "Tape Librarian" and the broader category of "File Clerk", as light

work.  Light work requires lifting only ten pounds frequently and twenty pounds occasionally,

consistent with Plaintiff's RFC.  There is nothing in these DOT descriptions which suggests the

jobs could not be performed with a sit/stand option.  The vocational expert testified that although

a filing clerk would be filing all day long, in his experience, the job could be performed

consistent with the residual functional capacity described by the ALJ in the hypothetical.  The

ALJ can rely on the vocational expert's testimony when it is based upon a hypothetical question

including all of Plaintiff's limitations.  Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005).

Therefore, substantial evidence exists to support the ALJ's decision that Plaintiff can perform

past work as a file clerk.

## **<u>RECOMMENDATION</u>**

For the foregoing reasons, it is hereby recommended that:

1.  Plaintiff's Motion for Summary Judgment be denied [Docket No. 8];

2.  Defendant's Motion for Summary Judgment [Docket No. 10] be granted.


Dated: September 20, 2007             s/ Arthur J. Boylan
                                     Arthur J. Boylan
                                     United States Magistrate Judge


Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before October 3, 2007.